```
                  IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
                          FORT WORTH DIVISION
```

SALVADOR RAMIREZ, ET AL.        §
                                §
VS.                             §    CIVIL ACTION 4:07-CV-618-Y
                                §
CITY OF FORT WORTH, ET AL.      §

## ORDER GRANTING MOTION FOR SUMMARY JUDGMENT

This is a civil-rights action brought by plaintiffs Salvador and Hilda Ramirez on behalf of their son, Edgar Ramirez ("Edgar"), for the alleged excessive use of force by City of Fort Worth Police Officer Gabriel Medrano. Officer Medrano shot Edgar after Edgar tried to intervene in an arrest at South Hills High School ("SHHS"). He suffered wounds to his chest and biceps. Officer Medrano has filed a motion (doc. #13) for summary judgment asserting his entitlement to immunity against Edgar's cause of action under 42 U.S.C. § 1983 for the excessive use of force, a violation of the Fourth Amendment of the Constitution of the United States. Officer Medrano contends that his use of deadly force was reasonable. After review, the Court agrees and concludes that the motion should be GRANTED.

I.  Factual Background[1]

Brothers Alex and Edward Campbell are members of a street gang named "Vario Centro" ("VC"). On September 8, 2006, the brothers entered the SHHS campus looking to fight members of a rival gang

---

[1] The following exposition of the facts is the product of viewing the evidence in the light most favorable to Plaintiffs.

named "Sur 13." At the time of the incident, Alex was a fifteen-year-old SHHS sophomore but his seventeen-year-old brother, Edward, was not enrolled at SHHS.

From a Braums restaurant located across the street from SHHS, Alex phoned his brother and asked him to join him in a fight against Sur 13 members at SHHS. Edward agreed and he met Alex at Braums. From there, the two walked across the street and entered the SHHS campus. As many as four to six students who were present at Braums, including an individual named Adan Rodriguez, who is also a VC member, followed the brothers.

As this group of people traversed the school grounds, the size of the group following the brothers in anticipation of the fight grew to approximately fifteen to twenty. The group passed the cafeteria as Edgar was exiting. Edgar noticed his friends Joel Aguirre, Juan Castillo, and Luis Garcia walking with the crowd, and he joined them and the crowd as it proceeded to a semi-circle road located on the campus. Alex and Edward, leading the crowd, stopped at the semi-circle road. They waited for a few minutes but when no one from the rival gang appeared, Edward decided to leave.

Officer Medrano was assigned to the SHHS campus. He received a call informing him of a possible fight and of the presence of persons who did not appear to be SHHS students. Charles Jackson, who was an SHHS campus monitor, overheard the call on his radio and proceeded to the location of the possible fight. Officer Medrano

responded to the call and confronted Edward before Edward could leave.

Initially, Edward was cooperative and complied with all of Officer Medrano's commands. Officer Medrano searched Edward and no weapons were found. He then proceeded to handcuff Edward when Alex approached and attempted to reach into Edward's pocket. Alex and Officer Medrano began exchanging words and Officer Medrano ordered Alex to get back. William Ray, another SHHS campus monitor, appeared on the scene observing Alex mouthing-off to Officer Medrano.

Officer Medrano gave a set of handcuffs to Ray and asked Ray to place the cuffs on Alex. Ray had no prior training in effecting arrests. He grabbed Alex and tried to swing him around against the wall. Ray ripped Alex's shirt and a struggle between them ensued. Ray wrestled Alex to the ground where he pinned him down and got on top of him.

By this time, the crowd of students, which included other VC members, gathered around Officer Medrano and Ray. Edward shouted at Ray to leave his brother alone. Edward shouted that Alex had nothing to do with this and that he did not deserve to be manhandled in that fashion. Edward then attempted to get away from Officer Medrano to help his brother. Edward become increasingly agitated and aggressive and he called out to the crowd for assistance.

At first, no one became involved. But after Edward repeatedly shouted in a threatening, profane, and aggressive manner for the crowd to assist, numerous students intervened. Three or four of the students, including Edgar, tried to pull Ray off of Alex. While one or two of the students struck Ray, Edgar never struck Ray or Officer Medrano; he only tried to pull Ray away from Alex.

As the violence continued to escalate, Officer Medrano began to scream at the crowd to get back and to back off. He brandished his firearm in an attempt to quell the violence. Edgar heard Officer Medrano yell to get back and saw him holding a black object in his hand. Officer Medrano was still struggling with Edward when numerous individuals from the crowd began creeping towards him. As he brandished his firearm, he saw in his peripheral vision a male in a white shirt advancing towards him. According to Officer Medrano, "I had multiple actors, subjects, actors . . . . I'm trying to fight these other guys away who were creeping towards me and not releasing and I would always return to the white shirt advancing. And when I saw that the white shirt was too dangerously close, I fired." (Pls.' App. at 34.) Joel Agguire, Edgar's friend, admitted that it was he and not Edgar who ran "up to Officer Medrano in an attempt to attack him" despite Officer Medrano's waving his gun and in spite of Officer Medrano's commands to get back and to get down. (*Id.* at 217.) Agguire said he came

4

to a few feet of Officer Medrano when Medrano fired the shot. (*Id.*)

Upon hearing Officer Medrano's command, Edgar had begun to step back when he heard a gunshot. He tried to run, but felt pain in his chest and left arm as he fell to the ground. He was taken to the hospital and released that night to the Fort Worth juvenile detention center. Edgar was charged with felony assault on a public servant and engaging in organized criminal activity. He pled guilty to misdemeanor hindering apprehension. Edgar states,

> It is important to me and my family for the Court to know that I am not now nor have I ever been a gang member. I have never joined in any gang nor participated in any gang activities. I certainly was not acting as a gang member on September 8, 2006, when I was shot. Any accusation that I am or ever have been a gang member is false.

(*Id.* at 3.)


II. Standard

A. Summary-Judgment Standard

When the record establishes "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," summary judgment is appropriate. FED. R. CIV. P. 56(c). An issue is considered "genuine" if "it is real and substantial as opposed to merely formal, pretended, or a sham." *Bazan v. Hidalgo Cty.*, 246 F.3d 481, 489 (5th Cir. 2001) (citing *Wilkinson v. Powell*, 149 F.2d 335, 337 (5th Cir. 1945)). Facts are considered "material" if they "might affect the outcome

of the suit under governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

To determine whether there are any genuine issues of material fact, the Court must first consult the applicable substantive law to ascertain what factual issues are material. *Lavespere v. Niagra Mach. & Tool Works*, 910 F.2d 167, 178 (5th Cir. 1990). Next, the Court must review the evidence on those issues, viewing the facts in the light most favorable to the nonmoving party. *Id.*; *Newell v. Oxford Mgmt. Inc.*, 912 F.2d 793, 795 (5th Cir. 1990); *Medlin v. Palmer*, 874 F.2d 1085, 1089 (5th Cir. 1989).

In making its determination on the motion, the Court must look at the full record including the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits. *See* FED. R. CIV. P. 56(c); *Williams v. Adams*, 836 F.2d 958, 961 (5th Cir. 1988). Rule 56, however, "does not impose on the district court a duty to sift through the record in search of evidence to support" a party's motion for, or opposition to, summary judgment. *Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir. 1992). Thus, parties should "identify specific evidence in the record, and . . . articulate" precisely how that evidence supports their claims. *Forsyth v. Barr*, 19 F.3d 1527, 1536 (5th Cir. 1994). Further, the Court's function is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249.

To prevail on a summary-judgment motion, the moving party has the initial burden of demonstrating that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law. *See Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986). A defendant moving for summary judgment may submit evidence that negates a material element of the plaintiff's claim or show that there is no evidence to support an essential element of the plaintiff's claim. *See Celotex Corp.*, 477 U.S. at 322-24; *Crescent Towing and Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1994); *Lavespere*, 910 F.2d at 178.

To negate a material element of the plaintiff's claim, the defendant must negate an element that would affect the outcome of the action. *See Anderson*, 477 U.S. at 247. If the defendant moves for summary judgment alleging no evidence to support an essential element of the plaintiff's claim, the defendant need not produce evidence showing the absence of a genuine issue of fact on that essential element. Rather, the defendant need only show that the plaintiff, who bears the burden of proof, has adduced no evidence to support an essential element of his case. *See Celotex*, 477 U.S. at 325; *Teply v. Mobil Oil Corp.*, 859 F.2d 375, 379 (5th Cir. 1988).

When the moving party has carried its summary-judgment burden, the respondent must go beyond the pleadings and by his own evidence set forth specific facts showing there is a genuine issue for trial. *Arbaugh v. Y&H Corp.*, 380 F.3d 219, 222 (5th Cir. 2004)

7

(citing *Celotex*, 477 U.S. at 324); *see also* FED. R. CIV. P. 56(e). This burden is not satisfied by creating some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence. *See Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). If the evidence is merely colorable or is not significantly probative, summary judgment may be granted. *See Anderson*, 477 U.S. at 249-50.

B.  Qualified Immunity[2]

When a plaintiff seeks damages from a public official for actions taken under the color of state law, the public official may invoke his right to qualified immunity. *See Hafer v. Melo,* 502 U.S. 21, 26 (1991). Public officials performing discretionary functions enjoy immunity from suits for damages, provided their "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Because an official is entitled to immunity from suit, not merely from

---

[2] In his brief, Officer Medrano asserts that he is entitled to official immunity under Texas law against Plaintiffs' constitutional claims brought under section 1983. Texas' official immunity is a state common-law defense available to state governmental officials and employees sued in their individual capacities. *See Kassen v. Hatley,* 887 S.W.2d 4, 8 (Tex. 1994). It protects state officers and employees from personal liability in performing discretionary duties in good faith within the scope of their authority. *Id.* It applies only to state causes of action and it only immunizes the state official or employee from liability, not from suit. *See Eastland Cty Coop. Dispatch v. Poyner,* 64 S.W.3d 182, 192 (Tex. 2002). Qualified immunity, on the other hand, is immunity from suit. Further, under principles of federalism, the state of Texas could not immunize Officer Medrano if he does not qualify for qualified immunity. Therefore, Officer Medrano cannot raise Texas official immunity against Plaintiffs' section 1983 claims.

liability, immunity questions should be resolved at the earliest possible stage in the litigation. *See Hunter v. Bryant,* 502 U.S. 224, 227 (1991). The plaintiff bears the burden of showing qualified immunity's inapplicability. *See McClendon v. City of Coloumbia,* 305 F.3d 314, 323 (5th Cir. 2002)(*en banc*).

The Court employs a three-part inquiry when determining whether a public official is entitled to qualified immunity. *See Conroe Creosoting Co. v. Montgomery Cty., Tex.,* 249 F.3d 337, 340 (5th Cir. 2001). First, the Court must determine whether the plaintiff has actually alleged the violation of a constitutional or statutory right. *See Id.* If the plaintiff has, then the Court must determine whether, at the time of the alleged violation, that right was so clearly established that a reasonable public official in the defendant's situation would have understood that his conduct violated that right. *See Brewer v. Wilkinson,* 3 F.3d 816, 820 (5th Cir. 1993). This second part is often referred to as "objective reasonableness." Thus, "whether an official protected by qualified immunity may be held personally liable turns on the 'objective reasonableness' of the action . . . assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987). Finally, the Court must "determine whether the record indicates that the violation occurred, or gives rise to a genuine issue of material fact as to whether the defendant actually engaged in the conduct

9

that [is alleged to have] violated the clearly established right." *Conroe Creosoting*, 249 F.3d at 340.  Qualified immunity "provides ample protection to all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

III. Analysis
    A.   Due-Process and Eighth Amendment Claims

Stemming from Officer Medrano's deadly use of force, Plaintiffs contend that Edgar was deprived of his constitutional rights under the Fourth and Eight Amendments to be free from the excessive use of force, and that Edgar was deprived of his due-process rights and right to be protected against the excessive use of force under the Fourth and Fourteenth Amendments.

Plaintiffs' claims regarding the denial of his due-process rights under the Fourteenth Amendment fail as a matter of law.  The Supreme Court has made clear that "all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard, rather than under a 'substantive due process' approach."  *Graham v. Connor*, 490 U.S. 386, 396 (1989).  The due-process clause of the Fourteenth Amendment protects individuals once an arrest is complete and the person is in pretrial detention.

*See Gutierrez v. City of San Antonio,* 139 F.3d 441, 452 (5th Cir. 1998). The Fourteenth Amendment begins "to protect persons *after* the incidents of arrest are completed, *after* the plaintiff has been released from the arresting officer's custody, and *after* the plaintiff has been in detention awaiting trial for a significant period of time." *Id.* (emphasis in original)(internal quotations and citations omitted). Officer Medrano's use of force occurred before Edgar was arrested and in the course of his attempting to effect the arrest of Edward. Therefore, these claims must be analyzed under the Fourth Amendment and not the Due Process Clause in the Fourteenth Amendment. *Cf. Valencia v. Wiggins,* 981 F.2d 1440, 1443-44 (5th Cir. 1993)(holding excessive use of force on pretrial detainee is analyzed under Due Process Clause not Fourth Amendment).

The same is true to the extent Plaintiffs assert a violation of the Eighth Amendment. It protects against the imposition of cruel and unusual punishment. Therefore, Plaintiffs' Eighth Amendment claim must also fail as a matter of law. *See Graham,* 490 U.S. at 396.

B. Excessive-Use-Of-Force Claim

It is well settled that the excessive use of force in effectuating an arrest violates the Fourth Amendment. *See Graham v. Connor,* 490 U.S. 386, 394-95 (1989); *Ikerd v. Blair,* 101 F.3d

430, 433 (5th Cir. 1996). To "state a claim for excessive force in violation of the Constitution, a plaintiff must allege (1) an injury, which (2) resulted directly and only from the use of force that was clearly excessive to the need; and the excessiveness of which was (3) objectively unreasonable." *Ikerd,* 101 F.3d at 433-34 (internal quotations and citations omitted). The dispute here centers on whether Officer Medrano's use of deadly force was reasonable.

"Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham,* 490 U.S. at 396. In deciding whether the force used was reasonable, the Court undertakes a similar balancing to that used in determining whether a search or seizure was reasonable under the Fourth Amendment. *Id.*

> Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake . . . . Because the test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight . . . . The reasonableness of a particular use of

12

> force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . .

*Id.* at 396-97 (internal quotations and citations omitted). The inquiry is an objective one. *Id.* at 397. And the crucial question is

> whether the officers' actions are objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation . . . . An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.

*Id.* Here, the Court concludes that Officer Medrano acted reasonably.

The undisputed record shows that Officer Medrano was responding to a call regarding a possible fight between two gangs. When he arrived at the scene, he observed a large crowd of students and Edward, an individual who apparently was a member of the VC gang and not a student at SHHS. As he attempted to arrest Edward, Edward's brother, Alex, intervened. Despite warnings to stay back, Officer Medrano had to enlist the assistance of Ray, an untrained individual and a campus monitor, to arrest Alex. As Ray and Alex struggled, Edward began resisting Officer Medrano, became agitated and aggressive, and provoked members of the crowd into intervening. Edgar, along with numerous members from the crowd, intervened. A couple of individuals began hitting Ray, and at least one came at

13

Officer Medrano to attack him despite the fact that he was brandishing his weapon in an attempt to get the crowd and the interfering individuals to retreat.

When Officer Medrano fired his weapon, he said he believed that he and Ray were in immediate danger of serious bodily harm or death. Under these circumstances, Officer Medrano's belief is objectively reasonable. Both he and Ray were greatly outnumbered. While a search of Edward revealed no weapons, Medrano could not be certain that the numerous other individuals present were not carrying weapons. And, since the crowd surrounded Officer Medrano and Ray, an attack could have come from any direction and could have resulted in the taking and using of his own weapon against him.

Plaintiffs focus on the fact that during the altercation Officer Medrano and Ray incurred only minor injuries. But the determination of reasonableness is not governed by whether, after-the-fact, Officer Medrano and Ray can be shown to have actually suffered serious bodily injury. The purpose of permitting the use of deadly force in circumstances where an officer reasonably believes that he and others are under an immediate threat of serious bodily harm or death is to prevent such harm from occurring.

Plaintiffs also focus on the fact that Edgar only intervened to the extent that he tried to pull Ray off of Alex. Plaintiffs

14

asseverate that Edgar never hit Ray nor did he ever approach Officer Medrano to attack him. That also has no impact on the reasonableness of Officer Medrano's belief and actions. Officer Medrano was in the middle of a melee where he had a split second to determine whether his and Ray's safety were in severe jeopardy and the appropriate measures needed to secure their safety. It may very well be that at the time Officer Medrano shot, Edgar was only trying to pull Ray off of Alex. But others in the melee were attempting to inflict much greater harm, and Officer Medrano had no way of knowing what Edgar's intentions actually were.

Moreover, Edgar decided to join the group of individuals who were seeking to thwart both Ray's and Officer Medrano's legal right to detain Edward and Alex. It is undisputed that many in this group intended to do them severe bodily harm. At that point, Edgar assumed the risk that he would suffer the consequences of whatever measures Ray and Medrano had a legal right to employ to protect their safety. What's more, an officer caught in the middle of a violent melee is not required to first ascertain whether everyone involved is or intends to do him severe bodily harm before taking the appropriate measures, including employing the deadly use of force, to protect himself and others against that threat.

Finally, Plaintiffs argue that Officer Medrano's use of his gun was unreasonable because lesser forms of force were available. The test for the reasonableness of deadly force, however, is not

dependent on whether the officer employing such force had lesser forms of force at his disposal. As long as the officer believes, and his belief was reasonable, that he is in immediate danger of suffering serious bodily injury or death, he is authorized to employ deadly force to eliminate that danger. He is not required to first cycle through the lesser forms of force available to see if those first eliminate the threat.

IV. Conclusion

Officer Medrano's deadly use of force was objectively reasonable under the circumstances he faced on September 8. He is entitled to qualified immunity against Plaintiffs' constitutional claims for the excessive use of force and the failure to protect against the excessive use of force. Accordingly, all of Plaintiffs' claims against Medrano are DISMISSED WITH PREJUDICE.

SIGNED August 12, 2008.

*Terry R. Means*
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE